There are three argued cases today. The first of these is number 13-1232 in Ray Tillman. Mr. Doar. There is Mr. Doar. You may proceed. Good afternoon, your honors. In making my argument today, I want to start with what I believe both parties agree on and then explain where I disagree and where I believe it probably goes wrong. The first thing that I believe that both parties agree on is that a proposed modification cannot render the prior art unsatisfactory for its intended purpose. The reason that I believe that Apelli agrees with this proposition is the same reason that I started from this proposition in arguing the rejection. This proposition is expressly set forth in the manual patent examining procedure, which a predecessor court to this court has held represents official patent office policy, which is binding on the patent office with respect to rejection. I don't believe that the Apelli is currently intending to argue that, but I'll be happy to address that in more detail if they intend to contravene this official patent office policy as stated in the MPEP. Moving on, so what the MPEP says is that the proposed modification cannot render the prior art unsatisfactory for its intended purpose. This is the PTO's official interpretation of N. Ray Gordon, which is the case that I cited in my brief regarding this. So starting from this, this brings me to a second thing that I believe that both parties agree on, specifically that prior art reference E had a goal of hardware independence. The reason that I believe that both parties agree on... And your theory is that because of that, someone would not have combined E with Mizuguchi because Mizuguchi is inconsistent with hardware independence. Is that the theory? The theory is that it's not necessarily that someone wouldn't have combined it, it's that someone wouldn't have combined it in the way the examiner, the rejection was asserting was obvious. So it's possible that there's a lot of different ways to combine it, and in fact, I think that one of the issues... I'm not understanding, explain to me why what you're saying is different from what I was saying. Okay, sorry, because I think that there's different ways to combine two references, and I think that what we're looking at here is how did the examiner find... In other words, the rejection, the examiner said it would be obvious to make a modification to an MCR of E to result in a new modified device, and he was doing that based on the teachings of Mizuguchi. So I think the relevant inquiry is not just is there some way to combine the two, it's looking at the actual combination that the examiner was proposing in his rejection that the examiner says was obvious. I think that thing is actually at issue. And why wouldn't the combination have been made? I think the combination wouldn't have been made because if you look at the language from the actual rejection, it doesn't say that you're going to incorporate a MCR into a keyboard like the appellee is arguing in its brief. What it actually says is that you would incorporate a keyboard device into an MCR of E. And the reason there is I think that once you do that, you're no longer achieving the goal of hardware independence, and I think the appellee has agreed in its brief is in fact the goal of Mizuguchi. Well, while there may be an objective in Lee, one of the many objectives may be hardware independence, at column 7, lines 35 to 40, E clearly discloses an embodiment, although obvious configuration of electrical connectors would be required depending on the system utilized. Furthermore, in the present embodiment, the MCR may be installed directly inside the host computer unit. The MCR can be mounted as an integral part of the host computer unit, so that the user will not have to connect any external cables. So there is clearly an embodiment disclosed that is intended to be within the present invention in E, that is entirely within the host computer. And that's something that I think that's the example the appellee is really seizing on. And one of the things the appellee says is, you know, just because these are physically together doesn't mean they're not hardware independent, and I completely agree there. I think, again, it goes back to what is the rejection that the examiner made, and I think that what that example shows is that, and what the appellee states in its brief, is that it's possible to take an MCR and incorporate it inside of a computer system unit. And that's what the example says. And the appellee says in its brief that in doing that, you're not undermining E's objective hardware independence, that that's still a hardware independent MCR. Why? Because from a technical standpoint, well, for one thing, I'm kind of trying to start from the appellee's words, but from a technical standpoint, I think it's because the cable configuration is still the same. So in E, it discloses that you're basically taking the same hardware independent MCR unit, and you're simply going to open up the computer case and install it inside. So you're just going to take it. You're going to put it inside. You're going to have the same cable configuration. It says in E specifically that you're still going to take the cables. You have cables running from your mouse and your keyboard. They're still going to run to this hardware independent MCR unit, and then you're going to have extension cables running from that MCR unit into the ports for the computer motherboard. I don't understand. Are you saying that a hardware independent item is outside of the claims here? I'm saying that E hardware independent is not inconsistent with the claims here, right? No, hardware independent is consistent with the claims of applicant here, but E's stated objective, E's goal is to create a hardware independent MCR, and what I'm saying is that modifying this MCR in the way that the examiner asserted would result in an MCR that is not hardware independent in contravention of E's goal, E's stated goal. I guess I'm not following your argument, so you're going to have to maybe dummy it down for me because Column 7, the lies I read to you, I don't see how that embodiment differs in any way from what you're claiming as expressed in the claim, in particular, removably receivable within a receptacle of an input device. I just don't see how the embodiment disclosed in E doesn't satisfy the limitation that is at issue. Okay. Well, I think the first thing would be just from a... Are you saying that the embodiment to which Judge Moore drew your attention is also hardware independent? Yes, I am. I'm saying that, and I think that the appellee states in its brief that that is also hardware independent and actually references that as an example. How could it be hardware independent if it's integrated within the hardware? It's not something that is attached externally. It's integrated inside of the computer host. I think that it is hardware independent because it's still, although it's physically located together, and this is something that I think the appellee and the appellant both agree on because the appellee explicitly states in its brief that in that example it is still hardware independent. I think the reason that it's hardware independent is because the actual hardware configuration, the cable configuration, is the same. In other words, all you're doing is opening up the box, if you will, and then placing the hardware independent MCR, which you haven't changed or modified in any manner whatsoever, into that box and then making the exact same cable configuration plug-in that you would if it was external to the box. So I think that where the appellee is basically acknowledging that this is still an example in which it's hardware independent, I think that its analogy, when it goes to analogize it to, okay, so if simply installing it inside the box is hardware independent, the appellee says, well, couldn't you also put it inside of a keyboard, inside of an input device? Again, I'm willing to grant that and acknowledge that, that if that was what the modification alleged to be obvious was, simply opening up a keyboard and placing it inside, placing a still hardware independent MCR inside of a keyboard device, I think that would be totally fine. But instead what the modification alleged to be obvious actually says was you were going to incorporate a keyboard into this MCR. And at that point, I think that you're not talking about simply physically locating them together. I think you're talking about something more. Kind of as an example, imagine some sort of little box. Like this is just for the recording, I'm holding up a classic iPod. Imagine this is an MCR. So this is just your basic MCR. You could certainly open up a computer system unit, put it inside, plug your cables in, the same as you would normally. But that is one very different thing. And let's say you want to do the same thing with a keyboard device. You can open up a keyboard device, place the MCR inside of the keyboard device. It's going to be tougher. You're going to have to get some sort of special tools. It's probably not going to have room. But if you found a keyboard that did have room or an MCR that's small enough, you could do it. But I think that's different from incorporating a keyboard into this thing. Like if you're going to incorporate a keyboard into this thing, you would end up with looking with something like this, which I'm now holding up a BlackBerry, which is a similar looking device that has a keyboard integrated or incorporated into it. And I think that there's no way to say that this keyboard device incorporated or integrated into this BlackBerry device is hardware independent. Yeah, but basically why does the fact that the objective of E is hardware independence mean that there can't be a motivation to combine it in a way that doesn't achieve the object of that original invention? The point is here to create a new invention, a new combination. And the fact that you'd have to sacrifice something from the old doesn't prevent you from creating the new, does it? I think if the – I'll be happy to present arguments to that. I can tell you that what I was focusing on was the case law, the N. Ray Gordon case law that I set out, and kind of the patent office policy that that in fact was a – that would make it an improper modification. That that modification would be improper if it in fact the prior art taught away from, and that's not the exact phrase. Teaching away can be used – there's a lot of different things that can mean teaching away. But the N. Ray Gordon case law that I'm looking at, if the modification would undermine one of the state's objectives, then that modification is improper. Well, but you keep talking about hardware independence, but that doesn't seem to me to be a key component of your claim as you recited. And I guess the question that occurs to me is, does ye teach away from physically incorporating the tracking device into a hardware component of the system? I would say no. Right. You can't say yes, because of Column 7. Definitely. I would say – But isn't that almost necessary for it to render obvious your claim? I don't think so, because I – and again, I apologize if I'm belaboring this or not explaining it clearly, which I clearly am not. But you're saying that because you sacrificed one of the objectives of ye when you made the combination, that that somehow fought away from making the combination. That's what your theory is. Yes. But teaching an alternative or equivalent isn't the same as teaching away. I agree, but I think that here ye actually has a goal of hardware independence. I mean, the appellee states in its brief references ye's goal of hardware independence. So I think that if you're going to – again, it's just the case law that I'm looking at, the N. Ray Gordon case law. But didn't Gordon render – the modification would have rendered the invention inoperable, completely unable to operate? Yes, it did. But that's not the case here. Here, the twist would be, well, it would still work, but it wouldn't be consistent with the goal of hardware independence. I agree, but I think that – I guess my only counter to that would be that if you're talking about what is it operable for, I would say it's operable for its intended purpose. I mean, that it's operable for the purpose the applicant set out to design it for. I mean, for instance, the device in Gordon, if you turn it upside down, it was operable for some purpose, because that's the whole reason that they wanted to turn it upside down, right? Because if you turn it upside down, it would have been the other invention that was trying to be claimed by the later applicant. So it clearly was still operable for something, but I think what Gordon is saying is the question is, is it operable for what that original purpose is, what that original applicant's purpose was? And in this case, I think it was – But I would seem to narrow the combinations you could make considerably. If there's a motivation to combine two things, what you're really saying is, well, the inventor of one of the original components wouldn't want to do that, and therefore you can't combine it. I'm not sure that I understand that's the law. I don't – I agree. I think that it's limited to cases where you have an explicit statement from an applicant in their application that this is one of their goals and that that's what they are pursuing. And again, I'll be happy to get up here and argue for or against one side. I'm merely trying to apply the current In Re Gordon case law, not necessarily rehabilitate it. I mean, if this court wants to decide against it or decide that it's no longer good law or it means that this is not an applicable situation, that's understandable, but that's kind of the context of what I'm trying to argue, if that makes sense. Okay. Thank you, Mr. George. I'm going to save the rest of your time for rebuttal. We'll give you two minutes. Excellent. Thank you. Mr. McConnell? Your Honor, may it please the Court? What this case comes down to is whether an ordinarily skilled artisan would have been led away from or would have been discouraged of making the combination of Yee's disclosure of a recording medium for recording inputs into a computer and Mizuguchi's teaching of incorporating a recording medium into an input device such as a keyboard or a mouse. Appellant Tillman claims that there would have been – such a person would have been discouraged in this case, that there would have been teaching away because of Yee's goal of hardware independence. However – Mr. McConnell, the PTO says that relevant inquiry is whether the prior art teaches away from the applicant's purposes and objectives, and Tillman responds that that's one relevant inquiry, but it's not the only relevant inquiry. Is the PTO's position that that was the only relevant inquiry? You know, the fundamental inquiry is just whether an ordinarily skilled artisan would have been led away. Does it make a difference that the inventor of one of the components' goal would not be achieved by the combination? Why is that relevant if someone skilled in the art would have been motivated to make the combination regardless? We believe that it's not, and additionally, the director vigorously disputes that Yee's goal of hardware independence, as actually defined by Yee, is incompatible with incorporating a recording medium into hardware such as an input device. Well, wait a minute. You just answered Judge Dyke's question, it is not, and I think that's a reasonable answer, but it does seem to conflict with what you say in your brief, the report that Judge Wallet quoted. He alleges the combination of Mizuguchi with Lee is inconsistent with Yee's stated objective and purpose. The relevant inquiry, however, is whether the prior art teaches away from the applicant's purposes and objectives, and you seem to suggest that the only inquiry here, the relevant inquiry, the one we've got to focus on, is whether this teaches away from the applicant's purposes or objectives, and that seems confusing to me, and you even italicized it, suggesting you wanted me to really pay attention to what you were writing and emphasizing it, but like me, I couldn't even understand why the PTO would want that framework, because it seems directly contradicted by all of our motivation to combine case law, which says any motivation is okay. It doesn't have to be the motivation the applicant sought. So explain to me how you could answer Judge Dyke's question the way you did, which seems to me completely inconsistent with what you claim you want me to do from a legal standpoint as described in your brief. Any motivation would work for purposes of combining the prior art, whether there would have been a reason for the person of ordinary skill to take two pieces of prior art and put them together. For the specific purpose of teaching away, though, again, the ultimate question is would a person have been led away, and for that, certainly the applicant's own objectives seem informative. Well, no, you didn't say informative. You said that's the relevant inquiry. You rejected any other inquiry as proposed by the appellant. So why is it, if the references teach away, because if you make this chemical composition, the thing is going to explode, so don't do it under any circumstances, and that is the reason for teaching away in that case in the prior art, but then the applicant's objectives in making the combination are maybe different because he came up with some way of making sure it doesn't explode. It's not really relevant, but it is different. Why would it have to be teaching away from what the applicant says to do? I don't understand. I feel like teaching away is the flip side of motivation to combine, and so for me, it's hard to imagine one standard would apply to motivation to combine, and a totally different standard would apply to teaching away. You're teaching away from making the combination, not teaching away from making the combination the way the applicant wants to make it. So I'm giving you a chance to try to explain to me why you think there ought to be two different standards. I would argue that under either standard, there's no teaching away in this particular case. Teaching away, the prior art always teaches or often teaches a variety of features, and some of them a particular applicant might want, others he may not, but teaching away focuses on, again, would a person have been discouraged, a person of ordinary skill, or would he have been led on a path that's divergent? The fact that a particular feature isn't available under a certain combination doesn't necessarily amount to a teaching away. The teaching away cases typically look to, again, does the prior art tell you that if you do it this way, it's inoperative, or its function is seriously degraded, or there's some other disadvantage to the combination or modification that's so serious that, again, the ordinarily skilled artisan wouldn't have done it that way. The case of In Ray Gordon that's discussed by Appellant is an excellent example. The claimed invention there involved a filter for filtering out blood, and part of whose novelty was that the blood is both inserted into the filter and removed at the bottom of the filter. The prior art patent called French from 1916 was an oil filter or a gasoline filter where the gasoline went in and came out from the top of the filter, and the office said, well, we'll just flip it upside down, and that renders the invention obvious. This court reversed in Ray Gordon on the ground that if you flip the French filter upside down, it wouldn't function as intended. The dirt would have gotten caught in the top, and there was no way to drain it. Gasoline would have gotten caught in the top. The invention would have been rendered inoperable. In this particular case, what is this invention about? This invention is about being able to record the data that's entered into a computer through a mouse or a keyboard with the additional variation that the recording medium is inserted directly into the input device. If we look at applicants' own statement of his objections in this case, which are stated directly. So would it be fair to say that you agree that even if there's no teaching to make the combination for the purpose that the applicant made the combination, that it's still obvious if there is another motivation to make the combination, which is different from the applicant's purpose? Yes, yes, and I won't add anything to that. That's exactly right. In this particular case, if you want to look at what is this invention really about, Tillman states three objectives or advantages of his invention. One is having a sort of a backup, a history of the computer so that you can recreate it. Another is simply having a history for its own sake of everything that's been entered into the computer. And the third is using this recording medium as an access device, as an authorization. None of these three objectives are at all inconsistent with the idea of incorporating the recording medium directly into the input device. Frankly, it would be a little strange if it were because that is the invention in this particular case. Another way to think about this case is what does it mean when something is patentable because the prior art teaches away? Well, it really starts out with a lot of concessions from the inventor. It basically means all of the features and limitations of the invention are actually disclosed in the prior art. Often that prior art is analogous or there's some other motivation to combine, but it still remains patentable because that prior art tells you that you can't combine these things, that there's some serious disadvantage or it's inoperative. And the invention, even though it's all already in the prior art, is that the inventor has found some way of overcoming that advantage or he's discovered that it's not there or that's why the invention remains patentable. Now look at what we have in this case. In this case, all the invention really amounts to is the prior art of Mizuguchi, a recording mechanism for recording data that's input into a computer, and Mizuguchi's disclosure of incorporating that directly into the input device. The invention is really simply nothing more than the sum of the prior art. And the purported teaching away, there's no barrier that's been overcome in this case, or no invention, no problem that's been gotten around. In fact, hardware independence is particularly defined by Appellant in this case, a characterization that the director does not accept. If it's accepted as defined by Appellant Tillman as not combining two devices, the hardware and the recording device, it's not even met in this case. The fact that this particular objective isn't even satisfied by the claimed invention, isn't even claimed, simply underscores the fact that this supposed teaching away is just about a feature that is not critical to this invention, doesn't go to its operability, simply isn't important to it, and therefore it's not something that would have discouraged the ordinarily skilled artisan from combining the prior art. Why would someone have combined these two pieces of prior art? Mizuguchi gives a couple of advantages of inserting a recording medium directly into a keyboard. One is reduced vibrations from the operation of the recording medium. I believe another one is simply fewer cables. It's a little more aesthetically pleasing, and then it's also convenient to the user. Those three advantages are all stated in Mizuguchi, and are all a reason to take the recording medium of Yi and put it directly inside the computer. Those three reasons alone apply motivation to combine the art in this case. If the panel would indulge me further on this point, the director also contends that Yi's stated objective of hardware independence as actually characterized by Yi is perfectly compatible with the combination with Mizuguchi. At page 876, column 2, starting at about line 20, Yi explains exactly what he means by hardware independence, and he means that a device is capable of performing its required tasks regardless of the equipment to which it's connected. So what he means by hardware independence is simply that your recording medium can work with any type of computer or keyboard or whatever, that it can be incorporated into any of those. He doesn't mean that it's physically separated. That's not his own definition. Really? Because actually you only quoted part of his definition. Hardware independence. When an ancillary machine is capable of performing its required tasks regardless of the characteristics of the equipment to which it's connected, doesn't the ancillary machine part kind of contradict what you just said? I mean, only reading a portion of the definition and then claiming the definition doesn't say it has to be a separate device when in fact the definition in fact does say that. It doesn't seem like a good way to convince the court. Well, we didn't want to overburden the court with the part of the definition we thought was irrelevant. Was it relevant or was it helpful? We believe ancillary in this case is simply a reference to the recording medium itself. When an ancillary machine is... Well, it's not entirely clear. But in any event, the point is confirmed that Yi's goals aren't inconsistent with combining the two devices by the fact that he has an embodiment that does combine the recording medium with the hardware. He discloses an embodiment that was discussed previously where the recording medium is built into the computer. So Yi himself, as he apparently defines hardware independence, simply does not define it in a way that means that the recording medium can't be built into the hardware. So even if this case was In-Rei Yi and Yi were the applicant in this case and we were looking at the invention from his perspective, even Yi himself doesn't discourage, doesn't seem to be in conflict with the idea of building a recording medium into some piece of hardware. So are you saying that in this case that embodiment informs the definition? Yes. It tells us... Yi actually states a whole series of... It tells us that the ancillary doesn't mean separate. I'll concede Judge Moore's point that it's at least unclear, but the embodiment does at least... Judge Moore's point wasn't that it was unclear. Judge Moore's point was that it was completely contradictory to what you represented to the court. Let's be clear. Okay. All right. I'll have to accept that. But again, you do have this embodiment that quite clearly would tell us what it is that Yi is pursuing. He states hardware independence is about being able to work with different devices and he shows us an embodiment of his invention in which the recording medium is directly incorporated into the computer. When an embodiment like that is completely at odds with a particular interpretation of what one of the objectives means, that's a pretty strong suggestion that that's not exactly what that objective is. But again, more fundamentally, this case isn't just about Yi and what he may have been pursuing. It's about, again, what would a reasonable... an artisan of ordinary skill have thought when he saw these two references? Would he have been discouraged? Would this have taught a way? This isn't a case like in Ray Gordon where flipping the device upside down makes it inoperable where the filter clogs and it no longer serves its purpose. This is a case where you have this one additional feature that a applicant may or may not have wanted, but again, it's a device about recording this data in a way that's convenient to the user and nothing about incorporating the device into an input device or the computer itself is inconsistent with that goal. It's something that undermines what the invention ultimately is about. Okay. Thank you, Mr. Mattel. I yield the floor. Mr. Dory, you have two minutes. Your Honors, I want to start with a couple of things that the appellee said that I kind of seized upon. The appellee in describing Yi talked about... asked the question, what is this invention about? And then went through to describe a whole lot of things. The one thing the appellee did not include in this list or purposely omitted from this list was hardware independence. This is despite the fact that the appellee in its brief acknowledges and admits that Yi's goal is hardware independence. I don't see how an invention can be about... when you're asking what the invention is about, how one of the goals of the invention isn't relevant to this inquiry. Similarly, the appellee at the end said this is not a case like Gordon where the invention based on the modification would no longer serve its purpose. I think that this is exactly like that. Because again, if the appellee is saying that Yi's goal is hardware independence and it is no longer hardware independent after the modification, it's certainly obvious in the rejection, then I think it's exactly a case where it no longer serves its purpose. Its purpose was to accomplish this goal of Yi, this goal of hardware independence. I don't think that you can really divorce the entire invention from this goal when the appellee has... I don't think the appellee can do that when the appellee has acknowledged this is one of the goals of the invention. The second thing I wanted to do was just kind of take a step back and acknowledge that... or kind of give an overview of... One, I think that both parties agree, although the appellee has kind of gone back on it a little bit, but I think both parties agree based on the NBEP that the proposed modification cannot render the prior art unsatisfactory for its intended purpose. This is the Gordon proposition that I just spoke about a second ago. Secondly, I agree that... or I think that Yi's goal of hardware independence is in fact undermined by the actual rejection. Again, I think what's relevant is the modification the examiner asserted to be obvious. The appellee repeatedly talks about incorporating an MCR into a keyboard, but the modification that was specifically asserted to be obvious is actually incorporating a keyboard into an MCR. I don't see how incorporating a keyboard into an MCR can possibly result in a device where the device itself is hardware independent of the keyboard that has been incorporated therein. Okay. Thank you, Mr. Doar. The case is submitted. We thank both counsel.